Opinion by
 

 Kenwobthey, J.,
 

 This is an appeal by the wife from a decree granting a divorce to the husband on the ground of indignities.
 

 The record presents a shocking picture. Twelve hundred pages of testimony to present issues which should have required, at most, two or three hundred! Motions and rules almost without end! In addition to the initial rule for counsel fee and alimony pendente lite, respondent filed a rule for a bill of particulars; rule to be permitted to file supplemental answer to libel; rule for jury trial; rule on libellant to enter security for future costs, counsel fees and expenses; rule on libellant to pay “necessary expenses incident to proper defense,” which was followed by depositions; rule on libellant for $500 additional counsel fee and $79.90 for additional expenses on which the court, after hearing, allowed counsel fee of $25 and $17.90 for expenses; rule to show cause why the master should not be removed, testimony stricken out and trial jury allowed; rule for commission to take testimony of foreign witnesses, on which there was a. hearing in open court; rule on libellant to pay all costs to date and for an additional counsel fee of $1,000, on which, after hearing, the court allowed $62.40 for expenses and $90 for additional counsel fee.
 

 In the beginning an effort was made, perhaps too zealously, to enforce the rules of evidence and keep the testimony within reasonable limits. Respondent would have none of it. And the combined resistance of counsel, master and the president judge on whom, in desperation, the master called several times for help, collapsed like a house of cards before her headstrong defiance. She made wholly irrelevant speeches containing inadmissible hearsay, which she knew to be improper;
 
 [1]
 
 
 *269
 
 she demanded police protection against bodily harm which she alleged she feared the master and counsel for libellant might inflict upon her; she openly charged the master and the president judge, in language amounting to contempt of court, with prejudice against her; she quarrelled with her own counsel whom she subsequently dismissed upon taking this appeal.
 
 [2]
 
 Finally, the situation became so insufferable, the president judge ordered that the remainder of her testimony be taken in open court so that he would be available for an emergency and directed that she be fully heard. Thereafter, she testified, almost without restraint, for three full days. Her testimony covered approximately 550 pages.
 

 Respondent complains of the exclusion by the master of certain evidence. In our opinion she was given a full and complete opportunity to prove everything relevant to her defense as well as much that was not. Although some of the rulings, standing alone, appear to have been erroneous, when regarded in the light of the whole record, they were not. In some instances, the evidence excluded was elsewhere introduced, and in the remaining instances respondent d.id not take advantage of other available means of introducing it.
 

 The parties were married in New York City, April 27, 1935. They were both residents of New York and they lived there together until February 6, 1936, on which date they separated. Apparently libellant’s family were people of considerable wealth and social position. Their home was in Richmond, Virginia. Respondent was a professional singer; her maiden name was Madeline Staggs, but she used two stage names, Madeline Randolph and Roslyn Wells. The parties met through the Christian Science Church, of which they were members. At the time of the marriage, libellant was thirty-seven
 
 *270
 
 years of age; respondent was-thirty-four. There were no children. Neither party had been previously married. Libellant’s friends appear to have been opposed to the union in the beginning. Difficulties arose almost immediately. And it is not easy to determine with confidence the real cause. Respondent complained, and this is the principal excuse for her conduct, that shortly after the marriage libellant advanced the idea that, according to the teachings of the Christian Science Church, their relationship as man and wife was sinful. On the other hand, she, in one of her numerous letters to libellant’s mother, admitted she had been “unresponsive” to him. Yet, both parties agreed their sexual relations had been normal throughout the entire time they lived together. Libellant flatly denied he harbored any such beliefs or that he ever expressed them to respondent. To explore any further would be to speculate about the most intimate of all human relationships. Perhaps respondent was, in the first instance, justified in discussing the alleged problem with her “teacher” or “practitioner”.
 
 [3]
 
 We doubt that she had the right to persist after the libellant asked her to discontinue. But she did not confine-herself to private consultations with her religious adviser. She insisted upon taking the whole world into her confidence. She charged libellant’s “teacher” with responsibility for libellant’s wrong theories. She wrote letters to libellant’s personal friends, complaining of his wrong attitude toward marriage and children, and sought to invoke their help in straightening him out. On one occasion, she, publicly before a group at church, ridiculed his alleged beliefs. After libellant employed an attorney, she conducted a voluminous correspondence with the attorney, in which she complained of libellant’s erroneous interpretation of the tenets of
 
 *271
 
 the church. She bombarded libellant’s parents with letters' of the same sort. She hid or destroyed books which libellant was reading, on the ground that they were responsible. On several occasions, she accused him, without foundation, of having associated with immoral girls, although she did not claim he had been guilty of any immoral conduct. She was possessed of an overweening vanity; the failure of libellant’s father to mention her affectionately in a personal letter from the father to his son, or the failure of a mutual friend to inquire about her would produce a tantrum. She refused to sit in church next to a woman who had been a friend of libellant before they were married and frequently taunted him about the other women who had supposititiously wanted to marry him. She continually nagged and abused him, keeping him awake late at night, and, on several occasions, created such a disturbance that the occupants of the apartment directly above complained. She called him a “sneak,” a “thief” and a “liar,” both at home and in the presence of others. iShe frequently called him at his office, sometimes as many as five or six times a day, to quarrel with him about his conduct, to demand that he change his ways, under penalty of having his friends insulted by her. On several occasions, she threatened to have him jailed. After they had separated, and in spite of a written agreement signed by both parties in which there was included a provision that neither party would molest or annoy the other, she persisted in writing him letters, calling him at the office and, on two occasions, after he moved to Philadelphia, she called on him personally. It would unduly prolong this opinion to attempt to recite all the details. As a result of her conduct, libellant was, at the time the libel was filed in June of 1938, on the^ verge of a nervous breakdown.
 

 Eespondent offered no convincing evidence of any indignities on the part of libellant and her own wit
 
 *272
 
 nesses agreed he always treated her with kindness and respect, “but appeared to be unhappy.”
 

 In our opinion, the charge of indignities is amply supported by the evidence.
 

 Respondent challenges the jurisdiction of the court below on the ground that libellant had not established a bona fide residence in this Commonwealth for the required period of one year prior to June 23, 1938, when the libel was filed. After the separation on February 6, 1936, libellant continued to live in New York until May 1, 1937. He testified that on that date, intending to make Philadelphia his permanent home, he gave up his residence in New York and rented a room at 827 S. 48th Street, Philadelphia, to which place he removed all his belongings. Until he was able to . secure a position in Philadelphia in June 1938, from which date he both lived and worked in Philadelphia, he commuted to his place of employment in New York. When the jurisdictional question was raised, the master asked respondent if she could suggest any persons with whom he might communicate and have produced as witnesses on the question of residence. She said she could not. The master then asked her: “Q. Do you know of your own knowledge where he lived? A. 827 S. 48th Street, I visited the place.” And again, “Q. Do you know of your own knowledge the various residences Mr. Addison lived at since February 1936 up to the present time? A. Yes. Q. What addresses do you know of your own knowledge? A. That’s the only address I know of my own knowledge.”
 

 We think the court had jurisdiction and, on its facts, the case is distinguishable from cases like
 
 Auerbach v. Auerbach,
 
 96 Pa. Superior Ct. 369.
 

 Decree affirmed, each party to pay his or her own costs.
 

 [1]
 

 On one occasion, after finishing a statement, she turned to the master and said, “You can strike that out if you want to.”
 

 [2]
 

 She was not represented below by the able counsel who presented her case in this court.
 

 [3]
 

 Although the -terms are not used interchangeably, the distinction between “teacher” and “practitioner” is not clear from the record.